

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
MIDLAND-ODESSA DIVISION

| | | |
|---|---|---|
| PAMELA JOHNSON, | § | CASE NO. 7:19-CV-00155 |
|        *Plaintiff,* | § | |
| | § | COMPLAINT FOR EQUITABLE RELIEF |
| v. | § | AND DAMAGES |
| | § | |
| L'ORÉAL USA S/D, INC., GARNIER LLC, and | § | *Demand for Jury Trial* |
| WALGREEN CO., | § | |
|        *Defendants.* | § | |

## PLAINTIFF'S ORIGINAL COMPLAINT

TO THE HONORABLE JUDGE OF SAID COURT:

COMES NOW PAMELA JOHNSON ("**Johnson**"), Plaintiff, complaining of L'ORÉAL USA S/D ("**L'Oréal**"), INC., GARNIER LLC ("**Garnier**"), and WALGREEN CO. ("**Walgreen**"), Defendants, and for cause of action respectfully show the Court:

### I.     INTRODUCTION

1.     This lawsuit is brought by Plaintiff PAMELA JOHNSON against L'ORÉAL USA S/D, INC., GARNIER LLC, and WALGREEN CO.  Plaintiff seeks damages and equitable remedies.

2.     Plaintiff's claims are: Unjust Enrichment (Count I); violation of the MAGNUSON-MOSS WARRANTY ACT (15 U.S.C. §§ 2301, *et seq.*) (Count II); Breach of Express Warranty (Count III); Breach of Implied Warranty (Count IV); violation of TEXAS DECEPTIVE TRADE PRACTICES ACT (TEX. BUS. & COMMERCE CODE § 17.41, *et seq.)* (Count V); Fraud (Count VI); and Deceptive Labeling (Count VII).

### II.     PARTIES

3.     Plaintiff PAMELA JOHNSON is a citizen of the State of Texas and a resident of Odessa, Ector County, Texas.  Plaintiff is a 60-year old female African-American.

4.     Defendant L'ORÉAL USA S/D, INC. is a foreign for-profit corporation organized under the Laws of the State of Delaware, registered to conduct business in the State of Texas with the Texas Secretary of State, and engaging in business in the State of Texas.  Its principal place of business is 10 Hudson Yards, New York City, New York 10001.  It may be served with process by serving its registered agent: **Corporation Service Co. d/b/a CSC–Lawyers Incorporating Service Co., 211 East 7th Street, Suite 620, Austin, Texas 78701-3218**.

5.      Defendant GARNIER LLC is a foreign for-profit domestic limited liability company organized under the Laws of the State of New York.  It is not registered to conduct business in the State of Texas with the Texas Secretary of State.  Its principal place of business is 10 Hudson Yards, New York City, New York 10001.  It may be served with process by serving its registered agent: **Corporation Service Co., 80 State Street, Albany, New York, 12207-2543**.

6.      Defendant WALGREEN CO. is a foreign for-profit corporation organized under the Laws of the State of Illinois, registered to conduct business in the State of Texas with the Texas Secretary of State, and engaging in business in the State of Texas.  Its principal place of business is 104 Wilmot Road, MS #1435, Deerfield, Illinois 60015.  It may be served with process by serving its registered agent: **Prentice Hall Corporation System, 211 East 7th Street, Suite 620, Austin, Texas 78701-3218**.

### III.      JURISDICTION & VENUE

7.      Jurisdiction of this Court is invoked under 28 U.S.C. § 1331, because this Court has original jurisdiction of all civil actions arising under the U.S. Constitution and laws of the United States.

8.      This Court has original jurisdiction under 28 U.S.C. § 1343.

9.      Venue is proper in the Western District of Texas, Midland-Odessa Division under 28 U.S.C. § 1391(b) because a substantial part of the events or omissions causing Plaintiff's claims took place in the District.  Defendants are engaged in business throughout the District, including promoting, selling, marketing, and distributing the Product.  Further, Plaintiff purchased the Product in the District.

10.     Consistent with the Due Process Clause of the Fifth and Fourteenth Amendments, this Court has personal jurisdiction over Defendants because they are present in the State of Texas, so requiring Defendants to appear does not offend traditional notions of fair play and substantial justice.  The Constitutional requirements of Due Process are met because Defendants, acting through their agents or apparent agents:

      a.   Transacted any business in the state;
      b.   Made any contract in the state;
      c.   Committed a tortious act in the state; or
      d.   Owned, used, or possessed any real property in this state.

## IV. Factual Allegations

### A. Mrs. Johnson's normal use of Defendants' Product has permanently injured her.

11.     On July 7, 2017, Plaintiff Pamela Johnson purchased L'Oréal Garnier Nutrisse Ultra Color BL21, "Blue Black," hair dyeing kit (also labeled "Garnier Nutrisse Ultra Color") (the "**Product**" or the "**Hair Dye**") at Walgreens in Odessa, Texas.  Mrs. Johnson had used that shade of the Product for several years without reaction or discomfort.

12.     Mrs. Johnson's daughter applied the Product to Mrs. Johnson's hair on July 8, 2017. This was their usual practice and Mrs. Johnson's daughter had applied Garnier Nutrisse Ultra Color BL21, "Blue Black," following Defendants' instructions for use, to color her mother's hair for several years without reaction or discomfort.

13.     Shortly after applying the hair color, Mrs. Johnson experienced pain, burning, itching, and blistering to her scalp, ears, and where the color dripped down her neck.  Her daughter immediately removed the hair color.  Over the next days, Mrs. Johnson's scalp, neck, ears, and temples swelled and developed painful, oozing blisters that lasted for weeks.  She noticed her hair broke and fell out.  She noticed extreme photosensitivity to the injured skin.

14.     Mrs. Johnson sought medical care soon after using the Product in July 2017.  She was treated for 2nd degree burns at a nationally-recognized burn center.

15.     She continues to undergo treatment, including painful injections into her scalp. Mrs. Johnson has permanent pigment changes to her skin in blotches on her scalp, temples, forehead, and neck—wherever the hair dye came into contact with her skin.  Her hair continues to be fragile.  Heat and bright sunlight cause her to feel a burning sensation on her head, neck, and ears.

16.     As a direct and proximate result of: (a) the false, misleading, or deceptive nature of Defendants' representations about the Products; (b) the defective and dangerous nature of the Product; (c) Defendants' deceptive labeling; (d) Defendants' fraud; and (e) Defendants' inadequate instructions for use and skin testing, Plaintiff Pamela Johnson experienced (and continues to experience), among other injuries: headaches, skin photosensitivity, pain, blisters, swelling, prurient discharge, lichenification, hyperpigmentation, hair loss, second degree chemical burns, and scarring.

**B. Defendants' claims and marketing to Plaintiff and women like her lulls them into a sense of safety and complacency.**

17.     Defendant L'Oréal developed, designed, formulated, manufactured, packaged, labeled, advertised, marketed, instructed use, labeled, distributed, and sold the Garnier Nutrisse brand Hair Dye for home use since about 1965, when L'Oréal acquired the Garnier brand.[1]

18.     The Product is a cosmetic, permanent hair dye to improve the appearance and change the hair color.  It is intended for home, non-professional use.  It is sold online and in retail stores, including Walgreens, Rite-Aid, Ulta, Wal-Mart, Target, Amazon, grocery stores, and Garnier's own website.[2]

19.     The Product "is exclusively designed to transform dark hair with ultra-reflective tones—in just one easy step!"[3]

20.     Defendants L'Oréal and Garnier product labeling markets the Product to Mrs. Johnson and other women with statements like: "Ultra Vibrant with Vivid Reflects"; "Ultra Long-Lasting"; "NOURISHED HAIR . . . Nutrisse lets you nourish your hair while you color"; "Non-drip creme formula"; "BOLDER COLOR Take your color to the next level with intensity-enhancing reflects that deliver ultra vivid transformation for the boldest you"; "SAME GREAT FORMULA"; "ULTRA COLOR BLACKS"; and "All brunettes can achieve ultra bold black reflects for high-impact color in just one step."[4]  The labeling recommends consumers, like Plaintiff, use the Product frequently and states: "We recommend coloring every 4–6 weeks."[5]  Defendants tell consumers the Product offers "easy hair color."[6]

---

[1] L'Oréal Group History, http://www.loreal.com/group/history/1957-1983 (last visited Oct. 19, 2017).

[2] Garnier Nutrisse Ultra Color, http://www.garnierusa.com/products/haircolor/nutrisse-ultra-color/black/intense-blue-black-bl-2-10.aspx (last visited Oct. 19, 2017); *see also* Product packaging.

[3] Garnier Nutrisse Ultra Color, http://www.garnierusa.com/products/haircolor/nutrisse-ultra-color/black/intense-blue-black-bl-2-10.aspx (last visited Oct. 19, 2017).

[4] Garnier Nutrisse Ultra Color, http://www.garnierusa.com/products/haircolor/nutrisse-ultra-color/black/intense-blue-black-bl-2-10.aspx (last visited Oct. 19, 2017) (capitalization as in original); *see also* Product packaging (capitalization as in original).

[5] Statements on packaging.

[6] Garnier, *How to Apply NUTRISSE Hair Color 101*, available at http://www.garnierusa.com/articles-tips/videos/hair-color/how-to-apply-nutrisse.aspx (last visited Oct. 22, 2017).

21.     Defendant L'Oréal markets the Product to Mrs. Johnson and other women.  L'Oréal tells Mrs. Johnson and other women:

> **For more than 100 years, Garnier has been creating innovative and accessible cosmetics to cover multiple beauty needs.  Today, Garnier is the 2nd largest brand in L'Oreal group and is sold in more than 64 countries.  Its driving force lies in its dynamic spirit and strong optimism.** [7]
>
> Pioneer in home hair color since 1960 . . . Garnier never stopped innovating and expanding around the world with Nutrisse . . . .
>
> In its constant quest of sensoriality and pleasure, Garnier draws its inspiration from the best scientific expertise, for instance through extracting high potential ingredients from nature.
>
> More than ever Garnier takes care of you with its innovations that make your daily life easier!

> **Hair and skin experts since 1904, Garnier blends active natural ingredients to offer all active men and women the healthy good looks that help them connect with others.** [8]
>
> Second largest brand of the L'Oréal Group, Garnier is an international haircare and skincare brand with sub-brands in four categories and seven areas of expertise— among which [are] Ultra DOUX, Fructis, Ambre Solaire, Nutrisse[,] or Olia.  With products formulated to meet the needs of every man and woman, everywhere in the world, we offer innovative, affordable care solutions at the best prices.
>
> . . .  Over the decades Garnier . . . cemented its reputation as the healthy beauty expert, by providing nature-based solutions to combat pollution, acne, UV[,] and fatigue.
>
> Garnier is renowned for its know-how in harnessing the bounty of nature—fruits, seeds, buds and flowers with highly beneficial skincare and haircare properties. Their active ingredients are extracted using the brand's cutting-edge expertise and techniques to take full advantage of nature's energy, effectiveness[,] and generosity.
>
> Garnier brings beauty to vast numbers of consumers . . . .

---

[7] L'Oréal, Brands—Garnier, http://www.lorealusa.com/brand/consumer-products-division/garnier (last visited Oct. 19, 2017) (emphasis in original).

[8] L'Oréal, Brands—Garnier, http://www.loreal.com/brand/consumer-products-division/garnier (last visited Oct. 19, 2017) (emphasis in original).

22.     Defendant Garnier markets the Product to Mrs. Johnson and other women with statements like:

> **The Nutrisse Ultra Color series is exclusively designed to transform dark hair with ultra-reflective tones—in just one easy step!** [9]
>
> The Nutrisse Ultra Color series is exclusively designed to transform dark hair with ultra-reflective tones—in just one easy step!  Choose from four shade families: Ultra Intense Reds for visibly intense red tones on darker hair, Ultra Lightening Browns to take dark hair up to three shades lighter without the brassiness, Ultra Reflective Blacks to transform even the darkest hair with visibly reflective, shiny tones, and Ultra Lightening Blondes to lighten dark bases up to 4 levels without the brassiness.
>
> **How is it different?**
> Nutrisse Ultra Color has color-boost technology that nourishes while it dramatically lifts even the darkest hair.  No bleach!
>
> **Is BL21 right for me?**
> Garnier Nutrisse Ultra Color BL21, "Blue Black," is one shade level lighter than BL 11 with ultra reflective blue tones. It is best for anyone with natural hair between light brown and black.

23.     Defendant Walgreen markets the Product to Mrs. Johnson and other women in this manner:

> - New tone enhancing technology [10]
> - Long lasting, 100% gray coverage
> - Silkier, softer, healthy-looking hair
>
> This color series transforms naturally dark hair with ultra reflective tones.  With the ultra reflective blacks, even the darkest of black shades are transformed with visibly reflective, shiny tones—in one simple step.  With tone enhancing technology for ultra long-lasting color with 100% gray coverage.
>
> - For silkier, softer, healthy-looking hair*
> - Start nourishing while you color with grapeseed oil
> - Non-drip creme formula spreads easily and smells great while you color
> - Nourishing avocado oil conditioner now infused with olive and shea oils
>
> *Vs. previous formula.

---

[9] GARNIER NUTRISSE ULTRA COLOR, http://www.garnierusa.com/products/haircolor/nutrisse-ultra-color/black/intense-blue-black-bl-2-10.aspx (last visited Oct. 19, 2017) (emphasis in original).

[10] WALGREENS, https://www.walgreens.com/store/c/garnier-nutrisse-ultra-color-nourishing-color-creme-permanent-haircolor/ID=prod6062788-product (last visited Oct. 19, 2017).

24.     Defendants L'Oréal and Garnier hold themselves out to be experts with statements they have "cutting-edge expertise and techniques"[11]; "best scientific expertise"[12]; "haircare . . . area[] of expertise"[13]; "healthy beauty expert"[14]; "innovative, affordable care solutions at the best prices"[15]; and "Garnier takes care of you with its innovations."[16]  As manufacturers of the Product, Defendants L'Oréal and Garnier are held to the highest level of knowledge of an expert in home hair dye products.  Therefore, they had a duty to label the Product honestly to apprise Plaintiff of the true risks and dangers of using the Product.  Instead, the deceptive labeling created a false impression of the safety of the Product.

25.     The American public, including Plaintiff, must rely on cosmetic companies and retailers like Defendants to distribute safe products.  The Product is not regulated by the U.S. FOOD AND DRUG ADMINISTRATION ("FDA").  Plaintiff relied, to her detriment, on Defendants, who opted to manufacture and distribute a home hair dye, the Product, which is defective in design or manufacture.

**C. Defendants' Product is improperly designed or manufactured, and Defendants do not properly disclose the risks associated with the Product's deficiencies.**

26.     The inherent design or manufacturing defect of the Product causes physical injuries and damages, including:

a)  Chemical burns to skin and scalp;
b)  Blistering of skin and scalp;
c)  *Lichen simplex chronicus* and lichenification;
d)  Scarring;
e)  Skin and scalp irritation;
f)  Photosensitivity of skin and scalp;
g)  Severe dermatitis;
h)  Eczematoid contact dermatitis;

---

[11] L'ORÉAL, Brands—Garnier, http://www.loreal.com/brand/consumer-products-division/garnier (last visited Oct. 19, 2017).
[12] GARNIER, *How to Apply NUTRISSE Hair Color 101*, available at http://www.garnierusa.com/articles-tips/videos/hair-color/how-to-apply-nutrisse.aspx (last visited Oct. 22, 2017).
[13] L'ORÉAL, Brands—Garnier, http://www.loreal.com/brand/consumer-products-division/garnier (last visited Oct. 19, 2017).
[14] L'ORÉAL, Brands—Garnier, http://www.loreal.com/brand/consumer-products-division/garnier (last visited Oct. 19, 2017).
[15] L'ORÉAL, Brands—Garnier, http://www.loreal.com/brand/consumer-products-division/garnier (last visited Oct. 19, 2017).
[16] L'ORÉAL, Brands—Garnier, http://www.lorealusa.com/brand/consumer-products-division/garnier (last visited Oct. 19, 2017).

  i) Skin depigmentation and hyperpigmentation;
  j) Vitiligo;
  k) Swelling of skin, scalp, ears, and other contact points;
  l) Significant hair loss;
  m) Eye irritation and tearing;
  n) Asthma;
  o) Gastritis;
  p) Renal damage or failure;
  q) Vertigo;
  r) Anaphylactic shock;
  s) Tremors, convulsions, comas; and
  t) Death.

(the "**Injuries**").

27. Even when used as directed, Defendants deceptive labeling minimized, glossed over, or ignored the negative risks, side effects, and Injuries associated with the Product, including the Injuries set forth above, and the long-term and cumulative effects of using the Product. Because of Defendants' deceptive labeling of the Product, Plaintiff believed the Product was safe to use.

28. Contrary to Defendants' labeling and marketing representations, the Product contains caustic ingredients.  The Product includes:

  a. p-Phenylenediamine ("**PPD**").  According to the NATIONAL INSTITUTES FOR HEALTH's Center for Biotechnology Information (a division of the National Library of Medicine) ("**CBI**"), p-Phenylenediamine "causes skin irritation" and skin "corrosion", "may cause allergic skin reaction" and skin "sensitization", "causes damages to organs" through a "single exposure, "causes damage to organs through prolonged or repeated use" with "skin absorption" being an exposure route. Further, "[a]cute (short-term) exposure to high levels of p-Phenylenediamine may cause severe dermatitis, . . . , renal failure, vertigo, tremors, convulsions, and coma in humans.  Eczematoid contact dermatitis may result from chronic (long-term)

exposure in humans."[17]  PPD "[i]s a skin . . . sensitizer."[18]  "Repeated or prolonged contact may cause skin sensitization."[19]  PPD "may have effects on the kidneys" and "may result in kidney impairment."[20]  It is a known "skin and respiratory system sensitizer."[21]  PPD was "banned in Germany, France[,] and Sweden in the early 1900's as a hair dye component and the hazard of PPD on health has been discussed for the past few decades."[22]  "PPD containing hair dyes have been associated with cancer and mutagenicity, with supportive evidences from both clinical and laboratory studies."[23]

    b.   N,N-Bis(2-Hydroxyethyl)-p-Phenylenediamine Sulfate.  Another form of PPD.  The "substance is a known skin sensitiser [sic] in humans."[24]

    c.   Hydrogen Peroxide.  "Hydrogen peroxide is a strong oxidizing agent."[25]  Further, it "is relatively unstable and solutions deteriorate over time."[26]  It has been noted

---

[17] PubChem, Nat'l Ctr. For Biotech. Info. ("**PubChem**"), https://pubchem.ncbi.nlm.nih.gov/compound/7814 (last visited Oct. 19, 2017); *see also*, H.P. Chong, *et al*., *para-Phenylenediamine Containing Hair Dye: An Overview of Mutagenicity, Carcinogenicity and Toxicity*, J. ENVIRON. ANAL. TOXICOL. 6:403 (2016).

[18] PubChem, https://pubchem.ncbi.nlm.nih.gov/compound/7814 (last visited Oct. 19, 2017) (last visited Oct. 19, 2017).

[19] PubChem, https://pubchem.ncbi.nlm.nih.gov/compound/7814 (last visited Oct. 19, 2017) (last visited Oct. 19, 2017).

[20] PubChem, https://pubchem.ncbi.nlm.nih.gov/compound/7814 (last visited Oct. 19, 2017); *see also* EPA, Fact Sheet for PPD, *available at* https://www.epa.gov/haps/health-effects-notebook-hazardous-air-pollutants (last visited Oct. 20, 2017).

[21] F.W. Mackison, R. S. Stricoff, L. J. Partridge, Jr. (eds.), *NIOSH/OSHA–Occupational Health Guidelines for Chemical Hazards*, DHHS(NIOSH) Pub. No. 81-123 (3 VOLS). Washington, DC: U.S. Government Printing Office (Jan. 1981).

[22] H.P. Chong, *et al*., *para-Phenylenediamine Containing Hair Dye: An Overview of Mutagenicity, Carcinogenicity and Toxicity*, J. ENVIRON. ANAL. TOXICOL. 6:403 (2016).

[23] H.P. Chong, *et al*., *para-Phenylenediamine Containing Hair Dye: An Overview of Mutagenicity, Carcinogenicity and Toxicity*, J. ENVIRON. ANAL. TOXICOL. 6:403 (2016).

[24] EU, Health & Consumer Protection Directorate-General, Scientific Committee on Consumer Products, *Opinion on N,N-Bis(2-Hydroxyethyl)-p-Phenylenediamine Sulfate* (adopted June 20, 2006), *available at* https://ec.europa.eu/health/ph_risk/committees/04_sccp/docs/sccp_o_065.pdf.

[25] MeSH, Nat'l Ctr. For Biotech. Info., https://www.ncbi.nlm.nih.gov/mesh/68006861 (last visited Oct. 19, 2017); *see also*, PubChem, https://pubchem.ncbi.nlm.nih.gov/compound/784 (last visited Oct. 19, 2017).

[26] MeSH, https://www.ncbi.nlm.nih.gov/mesh/68006861 (last visited Oct. 19, 2017); *see also*, PubChem, https://pubchem.ncbi.nlm.nih.gov/compound/784 (last visited Oct. 19, 2017).

there is an "accumulation of hydrogen peroxide in the skin of patients with the depigmentation disorder vitiligo."[27] Hydrogen Peroxide poses a danger for "[a]cute toxicity, dermal," "[s]erious eye damage/eye irritation," and "[s]kin corrosion/irritation."[28]

d. Laureth-12. The CBI warns Laureth-12 is harmful if swallowed and causes "serious eye damage" and eye irritation.[29]

e. Lauric Acid. The CBI warns Lauric Acid causes "Skin corrosion/irritation," "Serious eye damage/eye irritation," and asthma symptoms.[30]

f. Ammonium Hydroxide. This chemical causes "severe skin burns and eye damage, including skin," "corrosion/irritation." Ammonium Hydroxide has acute, dermal toxicity, "causes severe skin burn," and is "corrosive" to the skin. The effects of contact "may be delayed" and "skin contact with [the] material may cause severe injury or death." It is "toxic by all routes (*i.e.*, inhalation, ingestion, and dermal contact)" and "may cause contact burns to the skin". It may cause "redness", "serious skin burns," "pain," and "blisters." [31]

g. Sodium Metabisulfite. CAMEO Chemicals advises Sodium Metabisulfite "[s]trongly irritates skin and tissue."[32]

h. Pentasodium Pentetate. The CBI advises Pentasodium Pentetate causes "[s]kin corrosion/irritation," "[s]erious eye damage/eye irritation," and "[c]auses damage to organs through . . . repeated exposure."[33]

---

[27] Canadian Inst. of Health Research, Human Metabolome Database, http://www.hmdb.ca/metabolites/HMDB0003125 (last visited Oct. 19, 2017); *see also*, PubChem, https://pubchem.ncbi.nlm.nih.gov/compound/784 (last visited Oct. 19, 2017).

[28] PubChem, https://pubchem.ncbi.nlm.nih.gov/compound/784 (last visited Oct. 19, 2017).

[29] PubChem, https://pubchem.ncbi.nlm.nih.gov/compound/76460 (last visited Oct. 19, 2017).

[30] PubChem, https://pubchem.ncbi.nlm.nih.gov/compound/3893 (last visited Oct. 19, 2017).

[31] PubChem, https://pubchem.ncbi.nlm.nih.gov/compound/14923 (last visited Oct. 19, 2017).

[32] NAT'L OCEANIC & ATMOSPHERIC ASSO., CAMEO Chemicals ("**CAMEO**"), https://cameochemicals.noaa.gov/chemical/1500 (last visited Oct. 19, 2017); *see also*, PubChem, https://pubchem.ncbi.nlm.nih.gov/compound/656671 (last visited Oct. 19, 2017).

[33] PubChem, https://pubchem.ncbi.nlm.nih.gov/compound/8779 (last visited Oct. 19, 2017).

i.   Propylene Glycol (aka antifreeze).  Propylene Glycol is metabolized by the liver. There is no defined "acceptable level of Propylene Glycol."  Acute renal failure and skin irritation may be caused by exposure to the chemical.[34]

j.   4-Amino-2-Hydroxytoluene.  This compound causes "Skin corrosion/irritation," skin sensitization, and "Serious eye damage/eye irritation."[35]

k.   Polyquaternium-22.  The CBI identifies Polyquaternium-22 as a skin corrosive and skin irritant.[36]

l.   Ethanolamine.  This chemical is "[h]armful in contact with skin."  It is corrosive to skin and causes skin sensitization.  It causes "local injury to mouth, throat, digestive tract, skin, and eyes."[37]

m.   5-Amino-6-Chloro-O-Cresol.  The CBI warns this chemical causes skin corrosion and irritation.[38]

n.   Carbomer.  This compound's proper name is Acrylic Acid.  "It is a strong irritant to the skin, eyes, and mucous membranes in humans."  It is acutely "[t]oxic in contact with skin."  The chemical causes "severe skin burns and eye damage."[39]

o.   Stearamidopropyl Dimethylamine.  This chemical is a known skin corrosive.  It is also a known skin and eye irritant.[40]

p.   Chlorhexidine Dihydrochloride.  The CBI advises this compound is a skin and eye irritant with a danger of "[s]erious eye damage/eye irritation."  It can cause asthma, respiratory sensitization, respiratory irritation, and breathing difficulties.[41]

29.   The Product contains three parts: the colorant, the developer, and a conditioner. PPD is in the colorant.  PPD is a "white to purple crystalline solid . . . that turns purple to black in air as it oxidizes."[42]

---

[34] PubChem, https://pubchem.ncbi.nlm.nih.gov/compound/1030 (last visited Oct. 19, 2017).

[35] PubChem, https://pubchem.ncbi.nlm.nih.gov/compound/17818 (last visited Oct. 19, 2017).

[36] PubChem, https://pubchem.ncbi.nlm.nih.gov/compound/3083175 (last visited Oct. 19, 2017).

[37] PubChem, https://pubchem.ncbi.nlm.nih.gov/compound/700 (last visited Oct. 19, 2017).

[38] PubChem, https://pubchem.ncbi.nlm.nih.gov/compound/157641 (last visited Oct. 19, 2017).

[39] PubChem, https://pubchem.ncbi.nlm.nih.gov/compound/6581 (last visited Oct. 19, 2017).

[40] PubChem, https://pubchem.ncbi.nlm.nih.gov/compound/62109 (last visited Oct. 19, 2017).

[41] PubChem, https://pubchem.ncbi.nlm.nih.gov/compound/9552079 (last visited Oct. 19, 2017).

[42] CAMEO, https://cameochemicals.noaa.gov/chemical/17716 (last visited Oct. 19, 2017).

30.     Each of the chemicals the Product contains, including PPD, varies from each "shade" or color of hair dye the consumer purchases.[43]   For example, considering just the ingredients in the colorant portion of Garnier Nutrisse Ultra Color shade "BL21 Blue Black," PPD is listed 17th out of 26 ingredients; on shade "BL26 Reflective Auburn Black," PPD is listed 22d out of 26 ingredients; on shade "DN1 Light Cool Denim," PPD is listed 25th out of 29 ingredients; on shade "HL3 Golden Honey," PPD is listed 26th out of 31 ingredients; and on shade "BR3 Intense Burgundy," PPD is listed 26th out of 29 ingredients.   Not every shade or color of the Product contains the chemicals listed above.   PPD is not used in the lighter shades of the Product, *i.e*. "PL1 Lightest Platinum," "LB1 Ultra Light Cool Blonde."

31.     An analysis of PPD levels in hair dyes showed PPD levels to be significantly higher in darker colors or shades.[44]   The study reported "chromatography revealed that the concentration of PPD in brown hair dyes (mean, 3%) was higher than in blonde dyes (mean, 0.1–0.3%)."[45] Defendants' deceptive label fails to disclose that persons using darker hair dye shades or colors will be exposed to higher concentrations of PPD.

32.     Hydrogen Peroxide is the second greatest ingredient in the Product developer.[46] "Hydrogen peroxide is a strong oxidizing agent."[47]   Further, it "is relatively unstable and solutions deteriorate over time."[48]   The Product did not provide Plaintiff with an expiration date.

33.     Defendants failed to disclose the inherent design or manufacturing defects of the Product, which were known or, in exercising reasonable care, should have been known to Defendants.   These defects were unknown to Plaintiff at the time of purchase or use.   Therefore,

---

[43] "The ingredients must be declared in descending order of predominance." 21 C.F.R. § 701.3(a).

[44] J.M. Fernández-Vozmediano, *et al*., *Pattern of contact sensitization to paraphenylenediamine and its detection in hair dyes (Patrón de sensibilización por contacto a parafenilendiamina y su detección en tintes capilares)*, 102 ACTAS DERMO-SIFILIOGRÁFICAS (English Edition) 3, 206–11 (Apr. 2011).

[45] J.M. Fernández-Vozmediano, *et al*., *Pattern of contact sensitization to paraphenylenediamine and its detection in hair dyes (Patrón de sensibilización por contacto a parafenilendiamina y su detección en tintes capilares)*, 102 ACTAS DERMO-SIFILIOGRÁFICAS (English Edition) 3, 206 (Apr. 2011).

[46] Product labeling; *see*, 21 C.F.R. § 701.3(a).

[47] MeSH, https://www.ncbi.nlm.nih.gov/mesh/68006861 (last visited Oct. 19, 2017).

[48] MeSH, https://www.ncbi.nlm.nih.gov/mesh/68006861 (last visited Oct. 19, 2017).

Defendants' disclosure failure is an actionable misrepresentation or omission, and an unfair, unlawful, fraudulent, and deceptive business practice.

34.     Had Defendants disclosed to Plaintiff the true nature of the Product, that it could cause severe Injuries or death even when used as instructed by Defendants, she would not have purchased the Product.

### D. Defendants concealed the true risks of the Product and hid critical safety information.

35.     Defendants' claims are deceptive, inaccurate, misleading, and not supported by scientific fact.  Defendants, as hair color experts, knew or should have known that even when used as directed, the Product creates an unnecessary risk of injury.  Defendants' labeling of the Product is deceptive because it failed to disclose the negative effects, risks, and potential injuries associated with using the Product.

36.     In omitting, concealing, and providing inadequate safety information about the Product, Defendants engaged (and continue to engage) in conduct that misleads Plaintiff, who was induced to purchase and use the Product.  Plaintiff was damaged by Defendants' concealment and non-disclosure of the Product's defective nature because she was misled about the safety and value of the Product.

37.     As a direct and proximate result of the Product's defective nature, it is unfit for its intended use and purpose.

38.     The Injuries caused by the Product are more than *de minimus*.  Plaintiff, damaged by the Product, has permanent hair loss, permanent skin pigmentation changes, permanent scarring, permanent skin sensitivities, headaches, and daily scalp pain, amongst other Injuries.  Plaintiff has suffered injury including economic damages, as a direct and proximate result of purchasing or using the Product.

39.     Unlike Defendants, who are experts in hair dye, the dangerous and defective nature of the Product is not readily apparent to a typical, ordinary, reasonable consumer by examination of its ingredients list.  Reasonable consumers, like Plaintiff, would not recognize the dangers of the chemical ingredients because they would not know those various ingredients, what those ingredients do, how those ingredients work, and whether those ingredients are safe for using the Product as promoted, marketed, and labeled by Defendants.  An ordinary consumer, including Plaintiff, could not know, or be expected to know, how those ingredients/chemicals react to each other or the synergistic result of exposure to them by using the Product in one session, as directed

by Defendants.  Likewise, a reasonable consumer, like Plaintiff, would not expect a cumulative effect or cumulative increase in risk of injury through repeated use of the Product, as directed and encouraged by Defendants.

40.    In omitting, concealing, and inadequately providing critical safety information regarding the risks of using of the Product, and to induce its purchase and use, Defendants engaged in and continue to engage in conduct likely to mislead or deceive consumers, including Plaintiff. Defendants' conduct is fraudulent, unfair, and unlawful.

**E.  Defendants knew African-Americans, like Plaintiff, are more likely to be injured by the Product and PPD.**

41.    In 2006, PPD was named "Allergen of the Year" by the American Contact Dermatitis Society.[49]  The Society stated: "The primary route of exposure to PPD is through hair color, among consumers as well as among hairdressers."[50]  It further reported "PPD was a more important allergen for black persons" and "the incidence among the black patients was so high as to make PPD one of the most common allergens in those individuals."[51]  Defendants knew or should have known of these findings.

42.    A 2001 report from the world-renowned Cleveland Clinic revealed "a statistically significant difference . . . in the sensitization rate" for PPD in African Americans versus whites.[52] The report, which analyzed data collected from 1988 through 1991, showed African Americans have double the sensitization rates of whites.[53]  It also indicated that, besides the higher sensitivity of the consumer group, there was a higher concentration of PPD in Product for darker hair colors.[54] Defendants knew or should have known of these findings.

43.    In 2002, the JOURNAL OF THE AMERICAN ACADEMY OF DERMATOLOGY published research that confirmed the Cleveland Clinic's study, tying increased risks of PPD exposure to

---

[49] AMERICAN CONTACT DERMATITIS SOCIETY,
https://www.contactderm.org/i4a/pages/index.cfm?pageid=3467 (last visited Oct. 20, 2017).
[50] Vincent DeLeo, *Contact Allergen of the Year: p-Phenylenediamine*, 17 DERMATITIS 2, 53 (June 2006).
[51] Vincent DeLeo, *Contact Allergen of the Year: p-Phenylenediamine*, 17 DERMATITIS 2, 54 (June 2006).
[52] Heinrich Dickel, *et al.*, *Comparison of Patch Test Results With a Standard Series Among White and Black Racial Groups*, 12 AM. J. OF CONTACT DERMATITIS 2, 77 (June 2001).
[53] Heinrich Dickel, *et al.*, *Comparison of Patch Test Results With a Standard Series Among White and Black Racial Groups*, 12 AM. J. OF CONTACT DERMATITIS 2, 79 (June 2001).
[54] Heinrich Dickel, *et al.*, *Comparison of Patch Test Results With a Standard Series Among White and Black Racial Groups*, 12 AM. J. OF CONTACT DERMATITIS 2, 80 (June 2001).

persons of color.[55] The report reviewed data collected from 1992 through 1998.[56] Defendants knew or should have known of these findings.

44. The heightened sensitivity to PPD by persons of color is not a new realization. Scientific journals at least back to 1977 have reported on this. Fisher noted "Black patients readily acquire allergic contact dermatitis from such contactants as PPD" and "[s]uch dermatitis is often complicated by hyperpigmentation and lichenification."[57] Defendants knew or should have known of these findings.

45. A 2004 journal reported PPD as having "a role in chronic dermatologic conditions."[58] Until this reported connection to PPD in hair dye, the dermatological aetiology of *lichen simplex chronicus* was unknown.[59] Defendants knew or should have known of these findings.

46. Defendants knew or should have known consumers, like Plaintiff, were at a greater risk of experiencing an adverse reaction while using PPD compared to other hair dye products. Defendants knew or should have known that African-American consumers and others with darker skin were at an even greater risk of experiencing an adverse reaction to PPD.

47. Defendants deceptively labeled the Product that "Certain Individuals" may experience "Skin Irritation," with no further suggestion they were referencing skin color as the key to whether one is or is not a "Certain Individual." Defendants placed no restrictions or notices on the labeling that persons of darker skin, including those of African descent, Indian descent, or Middle Eastern descent, use of the Product or PPD on the Product's packaging, package inserts, or marketing materials despite the well-known, published findings about the increased risks of PPD to those populations.

---

[55] Vincent DeLeo, *et al.*, *The effect of race and ethnicity on patch test results*, J. AM. ACAD. DERMATOLOGY, S108 (Feb. 2002).
[56] Vincent DeLeo, *et al.*, *The effect of race and ethnicity on patch test results*, J. AM. ACAD. DERMATOLOGY, S108 (Feb. 2002).
[57] A.A. Fisher, *Contact dermatitis in black patients*, 20 CUTIS 3, 202–316 (Sept. 1977).
[58] Won Young Chey, *et al.*, *Allergic contact dermatitis from hair dye and development of lichen simplex chronicus*, 51 CONTACT DERMATITIS 1, 5–8 (Jul. 2004).
[59] Won Young Chey, *et al.*, *Allergic contact dermatitis from hair dye and development of lichen simplex chronicus*, 51 CONTACT DERMATITIS 1, 5 (Jul. 2004).

**F.  Defendants labeling deceptively ignored the sensitizing effects of repeated PPD use.**

48.     Many other scientific articles have specifically called out PPD in hair dyes as a risk for injury.[60]  In 1992, PPD was determined to be "the most frequent sensitizer" of hairdressers' clients causing contact dermatitis.[61]  A 2001 journal article investigating contact dermatitis caused by PPD in hair dyes specifically called out a Defendants L'Oréal and Garnier hair dye called "Garnier Movida."[62]  Defendants knew or should have known of these findings.

49.     An article published in 2006 found a link, in at least one scientific study, between hair dyes and certain cancers including bladder cancer, non-Hodgkin's lymphoma, and blood cancers such as myeloma and leukemia.[63]  A study published in 2016 confirmed those findings.[64]  Defendants knew or should have known of these findings.

50.     British researchers, among others, have studied the cumulative effects of PPD usage.[65]  Non-PPD allergic subjects were tested before and after using PPD hair dye each month for 6 months.  The subjects who used the PPD hair dye just six times showed PPD sensitization

---

[60] *E.g.*, Amir Zahir, *et al.*, *Tolerance to a Hair Dye Product Containing 2-Methoxymethyl-*P*-Phenylenediamine in an Ethnically Diverse Population of* P*-Phenylenediamine-Allergic Individuals*, 27 DERMATITIS 6, 355–61 (Nov. 2016); Vincent DeLeo, *et al.*, *The Association of Race/Ethnicity and Patch Test Results: North American Contact Dermatitis Group, 1998–2006*, 27 DERMATITIS 5, 288–92 (Sept. 2016); M. Kock, *et al.*, *Continuous usage of a hair dye product containing 2-methyoxymethyl-*para*-phenylenediamine by hair-dye-allergic individuals*, 174 BRIT. J. DERMATOLOGY, 1042–50 (May 2016); Heidi Søsted, *et al.*, *Contact allergy to common ingredients in hair dyes*, CONTACT DERMATITIS 69, 32–39 (June 2013); Heidi Søsted, *et al.*, *55 cases of allergic reactions to hair dye: a descriptive, consumer complaint-based study*, 47 CONTACT DERMATITIS 5, 299–303 (Nov. 2002); P. Gottlöber, *et al.*, *Allergic contact dermatitis in beauty parlor clients*, 52 HAUTARZT 5, 401–04 (May 2001); L. Guerra, *et al.*, *Contact dermatitis in hairdressers' clients*, 26 CONTACT DERMATITIS 2, 108–11 (Feb. 1992);  *see also*, materials referenced in same.

[61] L. Guerra, *et al.*, *Contact dermatitis in hairdressers' clients*, 26 CONTACT DERMATITIS 2, 108–11 (Feb. 1992).

[62] P. Gottlöber, *et al.*, *Allergic contact dermatitis in beauty parlor clients*, 52 HAUTARZT 5, 401–04 (May 2001).

[63] D.E. Rollison, *et al.*, *Personal hair dye use and cancer: A systematic literature review and evaluation of exposure assessment in studies published since 1992*, 9 J. TOXICOL. & ENVIRO. HEALTH 5, 413–39 (2006).

[64] H.P. Chong, *et al.*, *para-Phenylenediamine Containing Hair Dye: An Overview of Mutagenicity, Carcinogenicity and Toxicity*, J. ENVIRON. ANAL. TOXICOL. 6:403 (2016).

[65] Jonathan M.L. White, *et al.*, *A general population from Thailand: incidence of common allergens with emphasis on para-phenylenediamine*, 37 CLINICAL & EXPERIMENTAL ALLERGY 12, 1848–53 (Dec. 2007).

---

"substantially higher than in controls."[66]  The authors determined the "incidence of new cases of PPD allergy would indicate . . . PPD sensitization and allergy, . . . is a public health problem."[67] Defendants knew or should have known of these findings.

51.     On July 1, 2014, the NATIONAL INSTITUTE FOR OCCUPATIONAL SAFETY AND HEALTH ("**NIOSH**"), a division of CENTERS FOR DISEASE CONTROL & PREVENTION ("**CDC**"), advised PPD may cause "irritation pharynx, larynx; bronchial asthma; sensitization dermatitis."[68] Defendants knew or should have known of these findings.

52.     NIOSH and the CDC provide Americans with ready access to International Chemical Safety Cards ("**ICSC**").  ICSCs are prepared by an international group of experts on behalf of the INTERNATIONAL LABOUR ORGANIZATION ("**ILO**")and the WORLD HEALTH ORGANIZATION.  The ICSC for PPD, which is available on the CDC's website,[69] was published September 1997.[70]  The ICSC warned PPD "can be absorbed into the body . . . through the skin."[71] The agency identified "short-term exposure" effects to include "asthmatic reactions . . .[,] effects on the blood, resulting in formation of methaemoglobin . . .[, and] death."[72]  "Effects of Long-

---

[66] Jonathan M.L. White, *et al.*, *A general population from Thailand: incidence of common allergens with emphasis on para-phenylenediamine*, 37 CLINICAL & EXPERIMENTAL ALLERGY 12, 1848 (Dec. 2007).

[67] Jonathan M.L. White, *et al.*, *A general population from Thailand: incidence of common allergens with emphasis on para-phenylenediamine*, 37 CLINICAL & EXPERIMENTAL ALLERGY 12, 1848 (Dec. 2007).

[68] CDC, *Nat'l Inst. Occup. Safety & Health Pocket Guide to Chemical Hazards,* p-*Phenylene diamine*, *available at* https://www.cdc.gov/niosh/npg/npgd0495.html (last visited Oct. 21, 2017).

[69] CDC, NIOSH, ICSC*, p-PHENYLENEDIAMINE*, *available at* https://www.cdc.gov/niosh/ipcsneng/neng0805.html (last visited Oct. 21, 2017).

[70] ILO, ICSC no. 0805, *p-PHENYLENEDIAMINE - (1,4-Diaminobenzene, 1,4-Benzenediamine, p-Aminoaniline)* (Sept. 1997), *available at* http://www.ilo.org/dyn/icsc/showcard.display?p_lang=en&p_card_id=0805&p_version=2 (last visited Oct. 21, 2017).

[71] ILO, ICSC no. 0805, *p-PHENYLENEDIAMINE - (1,4-Diaminobenzene, 1,4-Benzenediamine, p-Aminoaniline)* (Sept. 1997), *available at* http://www.ilo.org/dyn/icsc/showcard.display?p_lang=en&p_card_id=0805&p_version=2 (last visited Oct. 21, 2017).

[72] ILO, ICSC no. 0805, *p-PHENYLENEDIAMINE - (1,4-Diaminobenzene, 1,4-Benzenediamine, p-Aminoaniline)* (Sept. 1997), *available at* http://www.ilo.org/dyn/icsc/showcard.display?p_lang=en&p_card_id=0805&p_version=2 (last visited Oct. 21, 2017).

Term or Repeated Exposure" were determined to be "skin sentitization," "asthma," and "kidney impairment."[73]  Defendants knew or should have known of these findings.

53.  The FEDERAL HAZARDOUS SUBSTANCES ACT ("**FHSA**") lists PPD as the first of five substances determined as a "strong sensitizer."  As defined by 16 C.F.R. § 1500.13, a "strong sensitizer" has "significant potential for causing hypersensitivity."  Defendants knew or should have known of these findings.

54.  Defendants placed no restrictions or information about cumulative effects or repeated use of the Product or PPD on the Product's packaging, package inserts, or marketing materials despite the well-known, published findings about the risks of repeated exposure to PPD.

55.  Once a person becomes sensitized to PPD, they are likely to remain sensitized for the rest of the person's life.  Defendants knew or should have known of the risk for hypersensitization but Defendants failed to put instructions or information related to PPD sensitization and hypersensitization.

**G.  Defendants failed to label PPD as a hazardous product.**

56.  Although it contains PPD, classified by the FHSA as a hazardous product, the Product's deceptive labeling did not inform Mrs. Johnson or other consumers.

57.  The U.S. ENVIRONMENTAL PROTECTION AGENCY ("**EPA**") publicized several links between PPD use or exposure and several acute and significant health problems including, but not limited to:

 a.  Severe dermatitis;

 b.  Eye Irritation and Tearing;

 c.  Asthma;

 d.  Gastritis;

 e.  Renal failure;

 f.  Vertigo;

 g.  Tremors, convulsions and comas; and

---

[73] ILO, ICSC no. 0805, *p-PHENYLENEDIAMINE - (1,4-Diaminobenzene, 1,4-Benzenediamine, p-Aminoaniline)* (Sept. 1997), *available at* http://www.ilo.org/dyn/icsc/showcard.display?p_lang=en&p_card_id=0805&p_version=2 (last visited Oct. 21, 2017).

h.   Eczematoid contact dermatitis may occur from repeated exposure.[74]

58.     Besides those injuries and the Injuries identified, PPD can cause systemic anaphylaxis, a severe, whole-body allergic reaction to a chemical.[75]   Defendants labeling deceptively omits any condition in the preceding paragraph on their packaging or product inserts.

59.     Defendants knew or should have known the chemicals in the Product, including, but not strictly limited to PPD, are associated with health serous risks including the Injuries described.  Yet, Defendants' deceptive labeling misled Plaintiff of the risk of Injuries.

**H.  Defendants know of safer alternative design to PPD.**

60.     There are safer, and cheaper, alternatives to PPD that Defendants could use in the Product.  However, despite the well-known, well-publicized risks of PPD, Defendants continue to use PPD in the Product.

61.     A 2011 scientific journal report published findings there is an alternative to PPD tolerated by all test subjects.[76]   The authors compared PPD with para-toluenediamine sulfate ("PTDS"), noting products containing PTDS "are as cosmetically elegant as" products with PPD.[77] The authors reported "a substantial number of individuals allergic to PPD will benefit from the availability of these new products."[78]

62.     Known safer alternatives to PPD include, but are not limited to:

a.   Henna-based hair dyes;

b.   Indigo-based hair dyes;

c.   Beetroot-based hair dyes;

d.   Nut shell-based hair dyes;

e.   PTDS hair dyes; and

f.      Other semi-permanent, also called demi-permanent, hair dyes.

---

[74] EPA, *Fact Sheet for PPD*, *available at* https://www.epa.gov/haps/health-effects-notebook-hazardous-air-pollutants (last visited Oct. 20, 2017)

[75] B.J. Goldberg, *et al*., *Systemic anaphylaxis due to an oxidation product of p-phenylenediamine in hair dye*, 58 ANN. ALLERGY 3, 208–08 (1987).

[76] Andrew Scheman, *et al*., *Alternative hair-dye products for persons allergic to para-phenylenediamine*, 22 DERMATITIS 4, 189–92 (July 2011).

[77] Andrew Scheman, *et al*., *Alternative hair-dye products for persons allergic to para-phenylenediamine*, 22 DERMATITIS 4, 189 (July 2011).

[78] Andrew Scheman, *et al*., *Alternative hair-dye products for persons allergic to para-phenylenediamine*, 22 DERMATITIS 4, 191 (July 2011).

63.     Defendant L'Oréal already manufactured, marketed, and sold PPD-free hair dye: L'Oréal Paris Excellence To-Go 10-Minute Crème Colorant.[79]  Other hair dye manufacturers offer PPD-free hair dyes: Madison-Reed,[80] ion Color Brilliance,[81] NaturVital Coloursafe.[82]  Clearly, Defendants are both aware of the risks of PPD in hair dye and the safer alternatives to PPD in hair dye.

## I.  Faced with permanent injury, Defendants instructed an inadequate skin patch test protocol.

64.     Consistent with 21 U.S.C. § 361(a), Defendants instruct Product users to conduct a preliminary test to help determine whether a user will adversely react the Product.  The preliminary test Defendants recommend and the directions and instructions for its administration are inadequate.

65.     The Mayo Clinic reported the incidence of positive PPD patch-test reactions to PPD in "patch test results" conducted between 1998 and 2000 at 5% of the population of tested individuals.[83]  Defendants knew or should have known of these findings

66.     Similarly, the North American Contact Dermatitis Group reported the incidence of positive patch-test reactions in "patch test results" conducted between 2001 and 2002 at just under 5% of the population of tested individuals. [84]  Defendants knew or should have known of these findings.

---

[79] Andrew Scheman, *et al*., *Alternative hair-dye products for persons allergic to para-phenylenediamine*, 22 DERMATITIS 4, 191 (July 2011).

[80] MADISONREED, *All About PPD (And Why We Don't Use It)*, https://www.madison-reed.com/blog/ppd-and-why-we-don-t-use-it (last visited Oct. 22, 2017).

[81] Available nationally at Sally Beauty Supply, http://www.sallybeauty.com/ion-color-brilliance-intense-neutrals-permanent-creme-hair-color/ION166,default,pd.html (last visited Oct. 22, 2017).

[82] NATURVITAL, *PPD Free Permanent Hair Color*, https://naturvital.co.uk/shop/ppd-free-natural-hair-dye-colour/coloursafe-no-ammonia-ppd-free-hair-colour/ (last visited Oct. 22, 2017), available at Amazon, https://www.amazon.com/Permanent-Coloursafe-Resorcinol-Parabens-Chestnut/dp/B00BWVZ5YC/ref=as_li_ss_tl?th=1&linkCode=sl1&tag=f0313-20&linkId=893ebb100669a080dd4f33dad682b824 (last visited Oct. 22, 2017).

[83] David Wetter, *et al*., *Patch test results from the Mayo Clinic Contact Dermatitis Group, 1998–2000*, 53 J. AM. ACADEMY OF DERM. 3, 416–21 (Sept. 2005).

[84] Melanie D. Pratt, *et al*., *North American Contact Dermatitis Group Patch Test Results, 2001–2002 Study Period*, 15 DERMATITIS 4, 176–83 (Dec. 2004).

67.     Later, the North American Contact Dermatitis Group reported the incidence of positive patch-test reactions in "patch test results" conducted between 2005 and 2006 at 5% of the population of tested individuals.[85]  Defendants knew or should have known of these findings.

68.     Despite the abundance of scientific and other published material evidencing a certain percentage of the population would react the Product, Defendants deception included failure to disclose such rates of reaction to consumers and the public, including Plaintiff. Therefore, Defendants labeling was deceptive of the true nature of the risks of using the Product.

69.     Defendants recommend a self-applied, at-home "skin patch test" on a consumer's inner arm/elbow before use.  Defendants recommend this test despite knowing that the skin on the scalp or head is more sensitive and may react differently than the inner arm/elbow or other parts of the body.  Defendants provide no guidelines on how to test the Product on a consumer's head or scalp before use.  Defendants knew or should have known that their recommended at-home skin patch test is an inadequate method to determine if a user will adversely react to PPD.

70.     A 24-hour test application of the hair dye "does not reliably predict all individuals allergic to PPD."[86]  The patch test alone can cause PPD sensitization.[87]  Defendants knew or should have known of these findings.

71.     Defendants recommend a 48-hour sensitivity test.  "This is known to be too short as patch test reactions may develop up to 7 days after application, and allergy may be missed."[88] It has been determined that a self-test "gives extremely large and uncontrolled variation in dose, duration of exposure[,] and other factors crucial to outcome."[89]  Therefore, self-testing as a valid

---

[85] Kathryn A. Zug, *et al*., *North American Contact Dermatitis Group Patch Test Results, 2005–2006 Study Period*, 20 DERMATITIS: CONTACT, ATOPIC, OCCUPATIONAL, DRUG 3, 149–60. (May 2009).

[86] John P. McFadden, *et al*., *Clinical and experimental aspects of allergic contact dermatitis to para-phenylenediamine*, 29 CLINICS IN DERMATOLOGY 3, 316–24 (May 2011).

[87] John P. McFadden, *et al*., *Clinical and experimental aspects of allergic contact dermatitis to para-phenylenediamine*, 29 CLINICS IN DERMATOLOGY 3, 316–24 (May 2011).

[88] EU, Health & Consumer Protection Directorate-General, Scientific Committee on Consumer Products, *Opinion on Sensitivity to Hair Dyes—Consumer Self Testing*, 8 (adopted Dec. 18, 2007), *available at*
https://ec.europa.eu/health/ph_risk/committees/04_sccp/docs/sccp_o_114.pdf.

[89] EU, Health & Consumer Protection Directorate-General, Scientific Committee on Consumer Products, *Opinion on Sensitivity to Hair Dyes—Consumer Self Testing*, 8 (adopted Dec. 18, 2007), *available at*
https://ec.europa.eu/health/ph_risk/committees/04_sccp/docs/sccp_o_114.pdf.

form to "test for contact allergy to hair dye substances is considered very low."[90]  Defendants knew or should have known of these findings.

72.     In December 2007, the European Commission Scientific Committee on Consumer Products released an Opinion titled "*Sensitivity to Hair Dyes—Consumer Self Testing*."[91]  The Committee concluded at-home skin tests, given to indicate whether an individual consumer might have a contact allergy to hair dye chemicals, were unreliable.  The Committee specifically found:

a.  Self-testing leads to misleading and false negative results giving individuals allergic to hair dye substances the false impression they are not allergic and not at risk of developing an allergic reaction by dyeing their hair.

b.  There is a potential risk that "self-tests" result in induction of skin sensitization to hair dye substances;

c.  The self-test recommendations were not standardized and were uncontrolled allowing for large variations in dose, number of applications, and duration of exposure;

d.  False negative results from self-testing are considered the largest problem;

e.  48-hours is known to be too short as patch test reactions may develop up to 7 days after application;

f.  Self-test locations on the arm or behind the ear are not reliable, while patch testing done on the back is good for reproducibility; and

g.  Self-tests are not performed or observed by trained observers. [92]

---

[90] EU, Health & Consumer Protection Directorate-General, Scientific Committee on Consumer Products, *Opinion on Sensitivity to Hair Dyes—Consumer Self Testing*, 8 (adopted Dec. 18, 2007), *available at*
https://ec.europa.eu/health/ph_risk/committees/04_sccp/docs/sccp_o_114.pdf.

[91] EU, Health & Consumer Protection Directorate-General, Scientific Committee on Consumer Products, *Opinion on Sensitivity to Hair Dyes—Consumer Self Testing* (adopted Dec. 18, 2007), *available at* https://ec.europa.eu/health/ph_risk/committees/04_sccp/docs/sccp_o_114.pdf.

[92] EU, Health & Consumer Protection Directorate-General, Scientific Committee on Consumer Products, *Opinion on Sensitivity to Hair Dyes—Consumer Self Testing*, 12 (adopted Dec. 18, 2007), *available at*
https://ec.europa.eu/health/ph_risk/committees/04_sccp/docs/sccp_o_114.pdf.

73.     The 48-hour sensitivity test "is in no way a substitute for a proper process of diagnostic testing and clinical assessment by a trained dermatologist."[93]   In fact, "there is no formally agreed/consistent approach recommended by the hair dye industry for the conduct of sensitivity testing."[94]   Defendants knew or should have known of these findings.

74.     Regardless of Defendants recommended self-test, it is known by Defendants "that only a small minority of consumers actually undertake a sensitivity test prior to each hair dyeing process."[95]   Defendant L'Oréal educates professional hairdressers to test hair color clients for skin sensitivity only once a year.[96]

75.     Defendants' labeling is deceptive as it did not, and does not, inform consumers like Mrs. Johnson that self-testing, such as the test recommended by Defendants, is inferior to a patch test administered and monitored by a dermatologist or similar trained, medical professional (a "**Medical Skin Patch Test**") and that a self-test is not an effective or reliable to determine whether an individual consumer might have a contact allergy to PPD.

76.     Nowhere on their product packaging, product inserts, webpage, or marketing materials do Defendants recommend consumers undergo a Medical Skin Patch Test before using the Product.

77.     The instructions inserted in the packaging provide these instructions for performing a skin allergy test:

    a.  Clean a quarter-size area on the inside elbow with soap and water;

    b.  "Using a plastic utensil, mix a dab of Nourishing Color Creme (B) with a few drops of the Nourishing Creme Developer (A) (the ratio should be one part Color Creme to 1 ½ parts Developer)";

    c.  Apply mixture with a cotton swab or ball;

    d.  "Let test spot dry.  Do not wash, cover[,] or disturb for 48 hours"; and

---

[93] David Orton, David Basketter, *Hair dye sensitivity testing: a critical commentary*, 66 CONTACT DERMATITIS 6, 312–16 (June 2012).
[94] David Orton, David Basketter, *Hair dye sensitivity testing: a critical commentary*, 66 CONTACT DERMATITIS 6, 312–16 (June 2012).
[95] David Orton, David Basketter, *Hair dye sensitivity testing: a critical commentary*, 66 CONTACT DERMATITIS 6, 312–16 (June 2012).
[96] L'ORÉAL PROFESSIONNEL PARIS, *Essential Guide Colour & Texture*, 75, *available at* education.lorealprofessionnel.com.au/uploads/essentials/Essential_Colour_Guide.pdf (last visited Oct. 22, 2017).

     e.  "Examine test spot periodically over the next 48 hours."[97]

78.  By video, Defendants instruct consumers "to perform a quick skin allergy run 48 hours before coloring."[98]  This assumes the consumer has a computer, which Plaintiff does not. Defendants tell consumers "it is best to test on a bend in the elbow."[99]  Defendants show the model merely wiping the area with a cloth, not using soap and water.[100]  Defendants then tell consumer to "take a few drops of creme developer A and a dab of nourishing color creme B.  Place a quarter-size amount of the mixture on the inner elbow area and leave it for 48 hours"[101]  The consumer is advised not wash, cover, or disturb the test area for 48 hours.

79.  During Defendants' version of an allergy test, _for two days_, consumers are unrealistically expected to:

     a.  Not shower;

     b.  Not wear long sleeve shirts;

     c.  Not accidently rub against anything;

     d.  Not sweat; and

     e.  Not close their elbow.

80.  Compliance with Defendants' version of a "skin allergy test" is unreasonable and essentially unfeasible.  Defendants failed to accurately measure testing or combining ingredients. The risk of accidental contamination is simply probable because the average consumer is not trained to conduct a test comparable to a Medical Skin Patch Test.  This renders the consumer-performed test useless.

---

[97] L'Oréal Garnier Nutrisse Ultra Color, Packaging Insert 3932475 (acquired July 2017).
[98] GARNIER, _How to Apply NUTRISSE Hair Color 101_, 1:05,
http://www.garnierusa.com/articles-tips/videos/hair-color/how-to-apply-nutrisse.aspx (last visited Oct. 22, 2017).
[99] GARNIER, _How to Apply NUTRISSE Hair Color 101_, 1:11,
http://www.garnierusa.com/articles-tips/videos/hair-color/how-to-apply-nutrisse.aspx (last visited Oct. 22, 2017).
[100] GARNIER, _How to Apply NUTRISSE Hair Color 101_, 1:11,
http://www.garnierusa.com/articles-tips/videos/hair-color/how-to-apply-nutrisse.aspx (last visited Oct. 22, 2017).
[101] GARNIER, _How to Apply NUTRISSE Hair Color 101_, 1:14,
http://www.garnierusa.com/articles-tips/videos/hair-color/how-to-apply-nutrisse.aspx (last visited Oct. 22, 2017).

81. Defendants knew or should have known a percentage of consumers would react to their products but failed to advise consumers to undergo proper allergy testing (*i.e*., a Medical Skin Patch Test) before using the Product.

82. Defendants knew or should have known their recommended test was not adequate because:

      a. The instructions and directions for use did not disclose that Defendants' at-home test was not a substitute for a Medical Skin Patch Test and that more accurate results could and would be obtained by conducting a Medical Skin Patch Test;

      b. The risk that Defendants' at-home test would be performed in the wrong area;

      c. The risk the amount of the Product used in Defendants' at-home test would be wrong;

      d. The arm is not the appropriate location for a skin allergy test, especially since the Product is to be used on the head and scalp;

      e. The risk of false negatives is high;

      f. The area tested is not covered or protected during the test; and

      g. The risk that the Product would be disturbed by clothing or daily activities is high.

83. Plaintiff detrimentally relied on Defendants' instructions to perform an at-home patch test.

84. Defendants knew or should have known that a consumer likely could not: (i) perform Defendants' at-home patch test properly; and (ii) obtain reliable results. In addition, Defendants know or should have known that sensitization to PPD during performance of an at-home skin patch test is likely to occur in a certain percentage of the population.

85. When sensitization occurs during a patch test, the consumer will react to the PPD more than 48 hours, or not, after exposure rendering Defendants' testing procedure unreliable and, therefore, useless. Due to the potential for PPD sensitization during a patch test, it is possible for consumers to have a negative skin patch test result and still have a severe reaction when they use the Product. Despite this, Defendants' deceptively labeled Product did not, and still does not, disclose the risks of sensitization during a skin patch test.

86. Defendants' further provide inadequate skin patch test instructions because Defendants use ambiguous words such as "a dab" and "a few drops," providing no direction as to

what equates to "a dab" or "a few drops" or what tools or methods to measure the actual amount of each chemical to ensure that correct amounts are being applied.

87.    Defendants failure to provide any instructions on what is meant by a "dab" amount of chemical(s), how many drops are "a few drops" of Developer, or how to make a 1:1.5 ratio of a creme to a liquid leaves the consumer to guess and speculate on the proper testing amount. Defendants' instructions on the at-home skin patch testing procedure are fundamentally flawed. Without precise measuring amounts or tools, it is impossible to determine what a "dab" or "few drops" amounts are and if a 1:1.5 ratio of each chemical is being mixed for skin patch testing purposes.

88.    Even if the Product's patch test was adequate and reliable, which it is not, the vague, ambiguous, and inadequate instructions for its use render the test wholly inadequate and useless. The Product's deceptive labeling fails to inform the consumer about the likelihood of adversely reacting to the Product by their at-home skin patch test instructions.

89.    Despite this knowledge, Defendants failed, and continue to fail, to adequately label the Product to inform their consumers, like Mrs. Johnson, they are exposed to a increased risk of suffering an adverse reaction as a direct and proximate result of using the Product.

**J.    Defendants hold themselves out as experts who can be trusted by consumers like Plaintiff.**

90.    Instead, as self-proclaimed "hair color experts," Defendants represent the Product to be safe and effective, particularly when used as directed, including performing their at-home skin patch test, and actively market the Product to consumers, including Plaintiff, knowing it is likely to cause serious and severe Injuries.

91.    Because the FDA has limited enforcement ability to regulate cosmetic companies under the FOOD, DRUG, & COSMETIC ACT ("**FD&C**"), 21 U.S.C. §§ 301, *et seq*., consumers, including Plaintiff, rely exclusively on cosmetic companies like Defendants with the autonomy to decide whether to manufacture and distribute safe products. Here, Plaintiff relied to her detriment on Defendants, who opted to manufacture, distribute, and sell a hair product defective in design or manufactured and sold by means of false, deceptive, or misleading advertising, marketing, or labeling.

92.    By marketing, selling, and distributing the Product to consumers throughout the United States, Defendants made actionable statements the Product was free of defects in design or manufacture, and it was safe and fit for its ordinary intended use and purpose. Further, Defendants

concealed what they knew or should have known about the safety risks resulting from the material defects in design or manufacture of the Product.

93.     Defendants, as manufacturers of the Product, are held to the level of knowledge of an expert in the hair color product, and had a duty not to conceal, omit, or misrepresent the safety risks resulting from the material defects in design or manufacture of the Product and how to use/apply the Product.  "Companies and individuals who manufacture or market cosmetics have a legal responsibility to ensure the safety of their products."[102]  Given Defendants' admitted superior knowledge and expertise, which is not shared by Plaintiff, they had a compelling obligation to make a full and fair disclosure of the safety and value of the Product concealing no facts within their knowledge.

94.     Plaintiff is unaware of a single clinical trial or study performed by Defendants related to the injury rate or safety of the Product.  Given the literature dating back decades relating PPD to serious adverse health events, including the Injuries described, Defendants' conduct is egregious.

## V.     CAUSES OF ACTION

### A.  Count 1: Unjust Enrichment.

95.     The paragraphs above are incorporated here as if set forth.

96.     A party is unjustly enriched when it retains a benefit to the detriment of another party against the fundamental principles of justice, equity, and good conscience.  Defendants have been unjustly enriched by engaging in the wrongful acts and omissions set forth; transactions with Plaintiff that intended to result in, and resulted in, sale of Defendants' Product.  Defendants have been unjustly enriched after making false, deceptive, or misleading representations in advertisements and on the labels or package inserts/instructions of the Product because Defendants knew, or should have known, the representations made were unsubstantiated, false, deceptive, or misleading.

97.     Defendants reaped revenue as a direct and proximate result of their scheme to mislead and deceive Plaintiff regarding their unsubstantiated, false, deceptive, or misleading

---

[102] FDA, *How FDA Evaluates Regulated Products: Cosmetics*, https://www.fda.gov/AboutFDA/Transparency/Basics/ucm262353.htm (last visited Oct. 22, 2017).

representations set forth.  That Defendants have amassed such earnings by deceptive and misleading behavior violates fundamental principles of justice, equity, and good conscience.

98.     Plaintiff has been damaged as a direct and proximate result of Defendants' unjust enrichment because she would not have purchased the Product on the same terms or for the same price had she known of the true dangers and hazards associated with the Product.

99.     Defendants continue to be unjustly enriched by the deceptive and misleading labeling and advertising of the Product.

100.     When required, Plaintiff is in privity with Defendants because Defendants' sale of the Product was direct or through authorized sellers.  Purchase through authorized sellers will create such privity because such authorized sellers are Defendants' agents for sale of the Product.

101.     As a direct and proximate result of Defendants' wrongful conduct and unjust enrichment, Plaintiff may have restitution of, disgorgement of, or imposition of a constructive trust upon all profits, benefits, and other compensation obtained by Defendants for their inequitable and unlawful conduct.

**B.   Count 2: Violation of the MAGNUSON-MOSS WARRANTY ACT.**

102.     The paragraphs above are incorporated here as if set forth.

103.     Defendants sold the Product as part of their regular course of business.  Plaintiff purchased the Product through Walgreens, an authorized reseller.

104.     The MAGNUSON-MOSS WARRANTY ACT, 15 U.S.C. §§ 2301, *et seq.*, provides a cause of action for any consumer damaged by the failure of a warrantor to comply with a written warranty.  The Product is a "consumer product," as that term is defined by 15 U.S.C. § 2301(1), as it constitutes tangible personal property distributed in commerce and which is normally used for personal, family, or household purposes.  Plaintiff is a "consumer" and "buyer," as defined by 15 U.S.C. § 2301(3), since she bought the Product for purposes other than resale.  Defendants are entities engaged in the business of making and selling cosmetics, either directly or indirectly, to consumers such as Plaintiff.  Defendants are "suppliers" as defined in 15 U.S.C. § 2301(4).

105.     Defendants made promises and representations in an express warranty provided to all consumers, which became the basis of the bargain between Plaintiff and Defendants. Defendants expressly warranted the Product was fit for its intended purpose by making the express warranties:

a. The Product "is exclusively designed to transform dark hair with ultra-reflective tones—in just one easy step!";

b. The Product causes "NOURISHED HAIR . . . Nutrisse lets you nourish your hair while you color";

c. The Product is a "Non-drip creme formula";

d. The Product is "easy hair color";

e. The Product will "Take your color to the next level";

f. The Product is the "SAME GREAT FORMULA";

g. Using the Product, "All brunettes can achieve ultra bold black reflects for high-impact color in just one step";

h. Defendants offer "cutting-edge expertise and techniques";

i. Defendants have "haircare . . . expertise";

j. Defendants have "the best scientific expertise";

k. Defendants are "healthy beauty expert[s]";

l. Defendants offer "innovative, affordable care solutions at the best prices"; and

m. Defendants' products are innovative.

106.    Defendants' written affirmations of fact, promises, or descriptions, as alleged, are each a "written warranty."  The affirmations of fact, promises, or descriptions constitute a "written warranty" within the meaning of the MAGNUSON-MOSS WARRANTY ACT, 15 U.S.C. § 2301(6).

107.    Defendants breached the warranty because the Product suffers from latent or inherent defects that cause substantial Injuries, rendering it unfit for its intended use and purpose. The defects substantially impair the use, value, and safety of the Product.

108.    The latent or inherent defects existed when the Product left Defendants' possession or control and was sold to Plaintiff.  The true nature of the defects was not discoverable by Plaintiff at the time of her purchase of the Product.

109.    All conditions precedent to seeking liability under this claim for breach of express warranty have been performed by or on behalf of Plaintiff in paying for the goods.  Defendants were placed on reasonable notice of the defect and their breach of the warranty, and have failed to cure the defects for Plaintiff, despite having reasonable time to do so.

110.    Defendants breached their express warranties since the Product did not contain the properties it was represented to possess.

111.    Defendants' breaches of warranties have caused Plaintiff to suffer Injuries, pay for a defective Product, and enter transactions she would not have entered for the consideration paid. As a direct and proximate result of Defendants' breaches of warranties, Plaintiff suffered damages and continues to suffer damages, including economic damages in the cost of the Product and the cost of efforts to mitigate the damages caused by using the Product.

112.    As a direct and proximate result of Defendants' breaches of these warranties, Plaintiff may have legal and equitable relief including damages, costs, attorneys' fees, rescission, and all such other relief deemed appropriate, for an amount to compensate her for not receiving the benefit of their bargain.  Plaintiff therefore seeks and may recover damages and other legal and equitable relief, injunctive relief, costs, and expenses, including attorneys' fees based upon actual time expended, as provided by the Act.

**C.  Count 3: Breach of Express Warranty.**

113.    The paragraphs above are incorporated here as if set forth.

114.    Defendants manufactured, marketed, distributed, and sold the Product as part of their regular course of business.  Plaintiff purchased the Product through Walgreens, an authorized retailer.

115.    Defendants, as the designers, manufacturers, marketers, distributors, or sellers, expressly warranted the Product was fit for its intended purpose by making the express warranties the Product was a safe hair dyeing product, as set forth.  Defendants made the foregoing express representations and warranties nationwide to all United States consumers, which became the basis of the bargain between Plaintiff and Defendants.  Express warranties were created that the Product would conform to Defendants' affirmations of fact, representations, promises, and descriptions, specifically, that:

   a.   The Product "is exclusively designed to transform dark hair with ultra-reflective tones—in just one easy step!";

   b.   The Product causes "NOURISHED HAIR . . . Nutrisse lets you nourish your hair while you color";

   c.   The Product is a "Non-drip creme formula";

   d.   The Product is "easy hair color";

e.   The Product will "Take your color to the next level";

f.   The Product is the "SAME GREAT FORMULA";

g.   Using the Product, "All brunettes can achieve ultra bold black reflects for high-impact color in just one step";

h.   Defendants offer "cutting-edge expertise and techniques";

i.   Defendants have "haircare . . . expertise";

j.   Defendants have "the best scientific expertise";

k.   Defendants are "healthy beauty expert[s]";

l.   Defendants offer "innovative, affordable care solutions at the best prices"; and

m.   Defendants' products are innovative.

116.   Defendants breached the foregoing express warranties by placing the Product into the stream of commerce and selling it to consumers, when the Product does not contain the properties it was represented to possess.  Rather, the Product suffers from latent or inherent design or manufacturing defects that cause substantial Injuries, rendering the Product unfit for its intended use and purpose.  These defects substantially impair the use, value, and safety of the Product.

117.   The latent or inherent design or manufacturing defects existed when the Product left Defendants' possession or control and was sold to Plaintiff.  The true nature of the defects was not discoverable by Plaintiff when she purchased the Product.

118.   As the manufacturers, suppliers, or sellers of the Product, Defendants actually knew of the breach.  Given the breach, (*i.e.* false representations regarding the Product), Defendants had knowledge that the representations made were false, deceptive, or misleading.

119.   Plaintiff was injured as a direct and proximate result of Defendants' breaches of warranties because she would not have purchased the Product had the facts been known; specifically, economic damages in the purchase of the Product, and Injuries from using the Product as directed by Defendants.  As a direct and proximate result of Defendants' breaches of these warranties, Plaintiff may have legal and equitable relief including damages, costs, attorneys' fees, rescission, and all such other relief deemed appropriate, for an amount to compensate her for not receiving the benefit of their bargain.

**D.  Count 4: Breach of Implied Warranty.**

120.   The paragraphs above are incorporated here as if set forth.

121.     Section 2-314 of the UNIFORM COMMERCIAL CODE provides a warranty, unless excluded or modified, that the goods shall be merchantable is implied in a contract for their sale if the seller is a merchant regarding goods.  To be "merchantable," goods must "pass without objection in the trade under the contract description," "run, within the variations permitted by the agreement, of even kind, quality and quantity within each unit and among all units involved," be "adequately contained, packaged, and labeled as the agreement may require," and "conform to the promise or affirmations of fact made on the container or label."

122.     Defendants formulated, manufactured, tested, marketed, promoted, distributed, and sold the Product as safe for use by the public, including Plaintiff who purchased the Product. Defendants knew the use for which the Product was intended and impliedly warranted the Product to be of merchantable quality, safe and fit for use.  Plaintiff reasonably relied on the skill and judgment of Defendants, especially as self-professed "hair color experts," and as such their implied warranty, in using the Product.

123.     However, the Product was not and is not of merchantable quality or safe or fit for its intended use, because it is unreasonably dangerous and unfit for the ordinary purpose for which it was used.  Specifically, the Product causes Injuries as described.

124.     Defendants breached their implied warranties because the Product does not have the quality, quantity, characteristics, or benefits as promised.  Defendants breached their implied warranties because the Product does not conform to the promises made on its labels or on Defendants' websites.

125.     As a direct and proximate result of one or more of these wrongful acts or omissions of Defendants, Plaintiff suffered injuries and damages.  Plaintiff was injured as a direct and proximate result of Defendants' breach because she would not have purchased the Product, had she known the facts that the Product did not and does not have the characteristics, quality, or value as impliedly warranted.

126.     As a direct and proximate result of Defendants' breaches of these warranties, Plaintiff may have legal and equitable relief including damages, costs, attorneys' fees, rescission, and all such other relief deemed appropriate, for an amount to compensate her for not receiving the benefit of their bargain.

### E. Count 5: Breach of Texas Deceptive Trade Practices Act.

127.     The paragraphs above are incorporated here as if set forth.

128.     Defendants marketing, sale, or distribution of the Product and Plaintiff's purchase of the Product was a sale or distribution of goods to a consumer within the meaning of the TEXAS DECEPTIVE TRADE PRACTICES ACT ("**DTPA**") (TEX. BUS. & COMMERCE CODE §§ 17.41, *et seq.*).

129.     Plaintiff purchased the Product for personal, family, or household use.  Plaintiff is a consumer under the DTPA.

130.     Defendants' acts or omissions through their false, misleading, or deceptive act or practice constitute a producing cause of economic damages and damages for mental anguish. Defendants made the following false, misleading, or deceptive representations:

    a.  The Product "is exclusively designed to transform dark hair with ultra-reflective tones—in just one easy step!";

    b.  The Product causes "NOURISHED HAIR . . . Nutrisse lets you nourish your hair while you color";

    c.  The Product is a "Non-drip creme formula";

    d.  The Product is "easy hair color";

    e.  The Product will "Take your color to the next level";

    f.  The Product is the "SAME GREAT FORMULA";

    g.  Using the Product, "All brunettes can achieve ultra bold black reflects for high-impact color in just one step";

    h.  Defendants offer "cutting-edge expertise and techniques";

    i.  Defendants have "haircare . . . expertise";

    j.  Defendants have "the best scientific expertise";

    k.  Defendants are "healthy beauty expert[s]";

    l.  Defendants offer "innovative, affordable care solutions at the best prices"; and

    m.  Defendants' products are innovative.

131.     Defendants advertised, marketed, and sold the Product as a safe hair dye product. In violation of the DTPA, Defendants falsely, misleadingly, or deceptively represented:

    a.  The Product has characteristics, uses, benefits, or qualities that the Product does not have;

    b.  The Product is of a particular standard, quality, or grade when the Product is not;

    c.  The Product as safe, with no intent to sell it as advertised; and

    d.   Deceptively labeling the Product as to instruction about the risk of Injuries from one-time or repeated use of the Product.

132.    Defendants breached their express or implied warranty.

133.    Defendants false, misleading, or deceptive acts or practices were unconscionable. Defendants, to Plaintiff's detriment, took advantage of Plaintiff's lack of knowledge, ability, experience, or capacity to a grossly unfair degree.

134.    Defendants intentionally or knowingly omitted, suppressed, or concealed that using the Product posed a significant risk of chemical burns, allergic reaction, and other Injuries, especially for African Americans and persons of color.

135.    Defendants intentionally or knowingly omitted truthful Product labeling that would have called attention to the Product's dangerous propensities, particularly for African Americans and persons of color.

136.    Defendants acted with intent because Defendants proceeded with actual awareness of the falsity, deception, or unfairness of the act or practice, or the condition, defect, or failure breaching a warranty causing Plaintiff's claim, coupled with the specific intent that Plaintiff act in detrimental reliance on the falsity or deception or in detrimental ignorance of the unfairness. Defendants acted with flagrant disregard of prudent and fair business practices.

137.    Defendants had actual awareness, at the time of the act or practice complained of, of the falsity, deception, or unfairness of the act or practice causing Plaintiff's claim.  Further, Defendants had actual awareness of the act, practice, condition, defect, or failure breaching a warranty.

138.    Plaintiff relied on Defendants' statements and representations to her detriment. Likewise, Plaintiff relied to her detriment that Defendants were not misleading her or concealing information from her.

139.    The misrepresentations and omissions of fact constitute deceptive, false, and misleading advertising in violation of the DTPA.  By performing the acts or omissions described, Defendants caused monetary damage to Plaintiff.  Plaintiff requests this relief:

    a.   Actual damages sustained by Plaintiff;

    b.   Three times actual damages;

c.  Appropriate injunctive relief in enjoining Defendant from continuing to violate Texas statutory law;

d.  Attorneys' fees and costs; and

e.  Such other and further relief as the Court deems proper.

**F.  Count 6: Fraud.**

140.  The paragraphs above are incorporated here as if set forth.

141.  As described, Defendants knowingly made material misrepresentations and omissions regarding the Product in their marketing and advertising materials, including the package in which the Product is sold and which contains the Product.

142.  Defendants made these material misrepresentations and omissions to induce Plaintiff to purchase the Product.  Plaintiff did purchase the Product.

143.  Rather than inform consumers about the dangers and hazards associated with using the Product, Defendants represent it as "easy hair color," amongst other false or misleading representations described above, such as:

a.  Represented the Product has sponsorship, approval, characteristics, ingredients, uses benefits, or qualities it does not have;

b.  Represented the Product is of a particular standard, quality, or grade, or that the Product is of a particular style or model, when it is of another;

c.  Deceptively labeled or deceptively instructed as opposed to how a manufacturer exercising reasonable care would and should have provided information about the risk of suffering Injuries from use or repeated use of the Product, particularly given the likelihood the Product would injure;

d.  Knowingly, intentionally, or recklessly omitted, suppressed, or concealed the true, unreasonably dangerous nature of the Product;

e.  Knowingly, intentionally, or recklessly omitted, suppressed, or concealed the use of the Product posed a significant risk of chemical burns, allergic reactions, and other Injuries, particularly among African Americans and persons of color; and

f.  Knowingly, intentionally, recklessly, or negligently labeling in a deceptive manner or otherwise calling attention to this dangerous propensity—which caused serious personal injuries to Plaintiff.

144.    The facts Defendants omitted, suppressed, or concealed as alleged in the preceding paragraph were material as they concerned facts that would have been important to a reasonable consumer, including Plaintiff, in deciding whether to purchase the Product.

145.    The Product is not a safe hair dyeing product.  Rather, it comprises caustic ingredients, including PPD, which is not safe and can cause serious Injuries.

146.    The misrepresentations and omissions made by Defendants, upon which Plaintiff reasonably and justifiably relied, were intended to induce, and did actually induce, Plaintiff to purchase the Product.

147.    Defendants knew the Product's ingredients, particularly PPD, were unsafe for use on the human head or scalp, but nevertheless made representations through its marketing, advertising, and product labeling, to sell the Product as a safe hair dye.  In reliance on these and other similar representations, Plaintiff was induced to, and paid monies, to purchase the Product. Had Plaintiff known the truth about the qualities of the Product and the dangers and hazards associated with using the Product, she would not have purchased it.

148.    As a direct and proximate result of Defendants' fraudulent acts and omissions, Plaintiff was injured and damaged.  As a direct and proximate result of Defendants' fraudulent acts and omissions, Plaintiff may have legal and equitable relief including compensatory and punitive damages, costs, attorneys' fees, rescission, and all such other relief deemed appropriate by the Court.

**G.  Count 7: Deceptive Labeling.**

149.    The paragraphs above are incorporated here as if set forth.

150.    Defendants designed, formulated, tested, manufactured, inspected, packaged, marketed, distributed, supplied, or sold the Product to Plaintiff.

151.    Plaintiff's use of the Product was as it was intended or reasonably foreseeable by Defendants.  However, use of the Product as directed by Defendants involved, and continues to involve, a substantial risk of producing Injuries.

152.    The risk of sustaining Injuries was known to Defendants or by exercising reasonable care should have been known to Defendants, given the generally recognized and prevailing knowledge available at the time of manufacture, design, distribution, or sale. Defendants, as self-professed hair color experts and hair color innovators, knew, or by exercising reasonable care should have known, the Product had, and continues to have, design defects.

153.    The Product is not safe as a hair dyeing product.  There is more than ample evidence demonstrating PPD is not safe for use on the skin.  Defendants, as self-professed hair color experts and hair color innovators, knew, or should have known, PPD could cause Injuries.  But Defendants failed to adequately disclose this vital information to consumers, including Plaintiff.

154.    Defendants knew Plaintiff, who purchased and used the Product for its intended use and as directed by Defendants, was and is a member of a foreseeable class of persons at risk of suffering serious inconvenience, expense, or injuries solely because of the Products design defects.

155.    Defendants, as the designers, manufacturers, distributors, marketers, or sellers of the Product, had a duty to exercise reasonable care for the safety of Plaintiff who used, was using, or intend to use the Product as directed by Defendants.  Since Defendants produced, manufactured, distributed, or sold the Product: (1) they owed a non-delegable duty to consumers, including Plaintiff, to exercise ordinary and reasonable care to properly design the Product; and (2) they had to label truthfully about the true dangers, hazards, or risks of suffering injuries associated with the intended use of the Product, as described above.

156.    Notwithstanding that duty, Defendants were negligent by one or more of these acts or omissions in that Defendants:

  a.  Deceptively labeled the Product so purchasers and users of the Product, including Mrs. Johnson, were not aware of the risks and potential dangers of using the defective Product as directed by Defendants;

  b.  Deceptively labeled the Product regarding safety of Plaintiff of using the defective Product as directed by Defendants;

  c.  Failed to adequately investigate the safety hazards associated with the intended use of the Product;

  d.  Negligently designed a Product with serious safety hazards and risks; and

  e.  Oversold the benefits while minimizing the true risks of suffering Injuries associated with the Product.

157.    Defendants knew, or by exercising reasonable care should have known; (1) of the true inherent design defects and resulting hazards and dangers associated with using the Product as directed by Defendants; and (2) Plaintiff could not reasonably know the true risks.  Defendants

failed to exercise reasonable care in providing nondeceptive labeling so Plaintiff understood and knew the potential for sustaining Injuries when using the Product as directed by Defendants.

158.    As a direct and proximate result of Defendants' negligent design, fraud, and deceptive labeling that use of the Product could cause Injuries, Plaintiff suffered damages explained above.

159.    As a direct and proximate result of Defendants' negligent design, fraud, and deceptive labeling consumers that use of the Product could cause injuries, Plaintiff may have legal and equitable relief including compensatory and punitive damages, costs, attorneys' fees, rescission, and all such other relief deemed appropriate by the Court.

160.    By marketing, selling, and distributing the Product to consumers throughout the United States, Defendants made actionable statements the Product was free of defects in design or manufacture, and it was safe and fit for its ordinary intended use and purpose, and it contained particularly valuable or superior attributes and qualities.  Further, Defendants concealed what they knew or should have known about the true safety and value of the Product.

## VI.    DEMAND FOR JURY TRIAL

161.    Plaintiff demands a jury trial.

## VII.    PRAYER

WHEREFORE, Plaintiff seeks judgment against Defendants:

a.  For an order declaring Defendants' conduct violates the statutes or laws referenced above;
b.  For an order finding for Plaintiff on all causes pleaded;
c.  For compensatory, statutory, and punitive damages in amounts to be determined by a jury or the Court;
d.  For prejudgment and postjudgment interest on all amounts awarded;
e.  For an order of restitution and all other forms of equitable monetary relief, including disgorgement of all profits and ill-gotten monetary gains received by Defendants from sales of the Product;
f.  For an order enjoining Defendants from continuing the unlawful practices pleaded; and
g.  For an order awarding Plaintiff her reasonable attorneys' fees and expenses and costs of suit.

Respectfully submitted,

AMBLERLAW, PLLC
511 N. Lincoln Avenue
Odessa, Texas  79761
P: 432.203.0303  |  F: 888.692.3331

By: _____

**Rachel Ambler**
State Bar No. 24081954
*Rachel@RachelAmbler.com*
**Attorneys for Plaintiff**